Clerk's Office
Filed Date:  9/12/22

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW
YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

ABRAHAM ADEYEMI,

                      Plaintiff,

          v.

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.

**MEMORANDUM & ORDER**
20-CV-3386 (MKB)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Abraham Adeyemi, proceeding pro se, commenced the above-captioned action

pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the

Social Security Administration (the "Commissioner") denying his claim for supplemental

security income ("SSI") under the Social Security Act (the "SSA").  (Compl., Docket Entry No.

1.)[1]  The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure, arguing that the findings of Administrative Law Judge Seth

Grossman (the "ALJ") were supported by substantial evidence.  (Comm'r's Mot. for J. on the

Pleadings ("Comm'r's Mot."), Docket Entry No. 12; Comm'r's Mem. in Supp. of Comm'r's

Mot. ("Comm'r's Mem."), Docket Entry No. 12-1.)  Plaintiff did not file an opposition to the

motion.

---

[1]  The Court "liberally construe[s] pleadings and briefs submitted by pro se litigants,
reading such submissions to raise the strongest arguments they suggest."  *McLeod v. Jewish
Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (per curiam) (quoting *Bertin v. United
States*, 478 F.3d 489, 491 (2d Cir. 2007)).

For the reasons discussed below, the Court denies the Commissioner's motion and remands this action for further administrative proceedings consistent with this Memorandum and Order.

## I.   Background

Plaintiff was born in 1991, (Certified Admin. R. ("R.") 73, Docket Entry No. 9), completed high school, and attended some college, (R. 48–49).  Plaintiff received SSI based on disability as a child.  (R. 10.)  Plaintiff previously worked as stocker at PetSmart but has not been employed since 2016.  (R. 93.)  As required by law, Plaintiff's eligibility for SSI was redetermined when he reached eighteen and it was determined that he was no longer disabled as of March 29, 2016.  (R. 10.)  On October 28, 2016, Plaintiff filed a written request for a hearing before an administrative law judge.  (R. 99.)  Plaintiff appeared before the Social Security Administration (the "Administration") on July 13, 2018 and February 21, 2019.  (R. 41, 133.)  On March 22, 2019, the ALJ found that since March 29, 2016, Plaintiff's impairments — including his schizoaffective disorder and substance use disorder — met Listing 12.03 (schizophrenia spectrum and other psychotic disorders).  (R. 12–14); *see* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03 (the "Listings").  However, the ALJ determined that substance use disorder was a contributing factor material to the determination of disability and that Plaintiff has not been disabled within the meaning of the SSA since March 29, 2016.  (R. 18.)  On May 28, 2020, the Appeals Council denied Plaintiff's request for review.  (R. 1–4.)  Plaintiff timely appealed to this Court.  (*See* Compl.)

### a.   First hearing before the ALJ

On July 13, 2018, Plaintiff appeared at his first hearing accompanied by witness Mohammad Garland from the Visiting Nurse Service of New York's Shelter Assertive

2

Community Treatment ("ACT") program.  (R. 26, 34.)  Plaintiff appeared without counsel.  (R. 30.)  After the ALJ informed Plaintiff of his right to have an attorney with him, Garland advocated for the ACT team to find Plaintiff an attorney.  (R. 32.)  Plaintiff requested that the hearing be adjourned for him to get an attorney.  (R. 33.)  The ALJ adjourned the hearing for Plaintiff to secure an attorney and also ordered that Plaintiff receive an updated consultative examination because the ALJ did not have any records.  (R. 33.)  The ALJ requested both psychiatric and internal medicine consultative examinations.  (R. 33.)

>    **b.  Second hearing before the ALJ**

On February 21, 2019, Plaintiff appeared at his second hearing without counsel.  (R. 41.) The ALJ heard testimony from Plaintiff, medical expert Neli Cohen, PsyD (the "ME"), and vocational expert Mary Vasishth (the "VE").  (R. 46–71, 298, 664–76.)

>    **i.  Plaintiff's testimony**

Plaintiff testified that he suffers from anger issues, schizophrenia, and other ailments. (R. 49.)  When he was eight or nine, he was hospitalized for anger issues and a suicide attempt. (R. 51.)  Prior to and following his hospitalization, he lived in group and foster homes.  (R. 51.) Plaintiff received his GED and attended Tompkins Community College in upstate New York for a short period before being suspended his freshman year for trespassing and marijuana use.  (R. 48–49, 345, 358.)

Plaintiff claims to have not been diagnosed with schizophrenia until he was twenty-five. (R. 51.)  Now, he regularly hears voices that say things that are not safe to share publicly. (R. 48–49.)  The voices are terrible and sometimes keep Plaintiff up until seven o'clock in the morning.  (R. 58.)  Plaintiff heard voices during the hearing before the ALJ.  (R. 49.)  Plaintiff took medication for his impairment before the hearing, but insists that his medication does not

make the voices go away.  (R.  49–50, 58.)  Plaintiff is taking several medications for his

impairments and complains that his medication makes him tired.  (R. 56.)  In 2015, Plaintiff

stopped taking his medication because of this side effect.  (R. 56–57.)  Plaintiff has used

marijuana on and off since he was seventeen.  (R. 49, 51.)  His marijuana usage helps his anxiety

and allows him to better cope with the voices he hears.  (R. 58, 63–64.)

Plaintiff worked at PetSmart for six months in 2016.  (R. 48, 50.)  He has a lot of memory

loss issues and has trouble staying focused.  (R. 50.)  When he was working at PetSmart he

would get "schizophrenia attacks" at work that caused him to lose track of his responsibilities

and become distracted.  (R. 50.)  This led him to quit.  (R. 50.)  Plaintiff was sober for three

months while working at PetSmart.  (R. 50.)  During the three months that he was sober he was

doing better and his paranoia improved.  (R. 50.)  It was difficult for him to work while on his

medication because it made him very drowsy.  (R. 63.)  Plaintiff has been homeless and has lived

in a housing residence serving men with mental health service needs since at least May of 2018.

(R. 65, 468.)  Plaintiff uses his SSI to pay for rent at the shelter and will likely be "kicked out on

the streets" if he loses his SSI.  (R. 65.)

### ii.   Medical expert testimony

The ME testified that Plaintiff was diagnosed with paranoid schizophrenia, substance

abuse, attention deficit hyperactivity disorder ("ADHD"), borderline personality disorder, and

schizoaffective disorder.  (R. 51–52.)  The ME stated that it would be difficult for her to rate how

Plaintiff's mental disorder limits his functioning because the record did not provide any testing

done on Plaintiff.  (R. 53.)  However, the ME testified that she believed that Plaintiff suffered

from schizoaffective disorder, not schizophrenia.[2]  (R. 53–54.)  The ME stated that Plaintiff was

psychiatrically stable from January of 2012 to January of 2016 and stated it is very rare that a

person with schizophrenia can stay psychiatrically stable for so many years in a row without

interruption.  (R. 53, 61.)  She stated that Plaintiff's psychological state was negatively affected

from 2016 to 2018 because Plaintiff was non-complaint with his medication and was smoking a

lot of marijuana.  (R. 53, 62.)

The ME believes the Plaintiff was predisposed for schizoaffective disorder because,

among other reasons, his use of marijuana increases his psychotic presentation in adulthood.  (R.

60–62.)  The ME opined that Plaintiff's marijuana usage actually prevents his medication from

fully working.  (R. 60, 63.)  The ME suggested that Plaintiff could do a routine, low stress job,

like organizing shelves.  (R. 62.)  She proposed this work as a good fit because it does not

require a great deal of concentration or attention, nor does it require much communication with

the public.  (R. 62.)

### iii.  Vocational expert testimony

The ALJ asked the VE to disregard the Plaintiff's past relevant work.  (R. 67.)  The ALJ

asked the VE to consider whether there were any jobs at all levels of exertion for a hypothetical

individual whose education and work experience are the same as Plaintiff's, and who is limited

to a simple task job with only occasional contact with supervisors and coworkers, and no contact

with the public.  (R. 68.)  The VE testified that such an individual could perform representative

---

[2]  The ME explained that "[s]chizophrenia is a much more severe diagnosis than
schizoaffective [disorder]."  (R. 53.)

unskilled and specific vocational preparation level two jobs[3] of addressing clerk — sedentary exertion level and approximately 18,000 jobs nationally; price marker — light exertion level and approximately 58,000 jobs nationally; and kitchen helper — medium exertion level and approximately 380,000 jobs nationally.  (R. 68–69.)   The VE also confirmed that all of the jobs he referenced were full-time and the hypothetical individual can be off task ten percent of the time and absent once per month with these type of jobs, but more than that is not sustainable. (R. 69–70.)

### c.   Other evidence before the ALJ

In addition to Plaintiff's testimony, the ALJ also considered Social Security Administration (the "Administration") records and Plaintiff's medical records from April of 2010 to June of 2018.

### i.   Social Security Administration records

In 2000, when Plaintiff was nine years old, he began receiving SSI benefits based on disability as a child with ADHD.  (R. 75.)  At that time, Plaintiff's impairments met Listing 112.11 for neurodevelopmental disorders.  (R. 75.)  When he turned eighteen, the Administration redetermined his eligibility for SSI disability benefits as an adult pursuant to 20 C.F.R. § 416.987.  (R. 11, 18.)  His eligibility ceased on August 5, 2009; however, Plaintiff continued to receive SSI benefits.  (R. 74–75, 90.)  When Plaintiff was twenty-four years old, his case underwent a second redetermination and he alleged continuing disability due to schizophrenia and hypertension.  (R. 74.)  On March 29, 2016, the Administration issued a notice to Plaintiff, finding that he was no longer eligible for SSI.  (R. 77.)  The Administration made its last SSI

---

[3]  A specific vocational preparation level of two involves anything beyond short demonstration up to and including one month.  *See* Dictionary of Occupational Titles (DOT), app. C, 1991 WL 688702.

payment on May 31, 2016.  (R. 77.)  Plaintiff requested reconsideration but failed to appear at his scheduled hearing or submit additional documentary evidence.  (R. 86, 90.)  After reviewing his file, a local Disability Hearing Officer determined that Plaintiff was not disabled and upheld the Administration's March 29, 2016 cessation of his benefits.  (R. 87–98.)

### ii.  Relevant Medical Records

Plaintiff was shuffled between foster care and group homes in his adolescence.  (R. 308, 315, 331.)  He was first hospitalized at Elmhurst Hospital when he was seven years old after multiple failed suicide attempts.  (R. 315.)  He attempted to jump out a window and later attempted to take his life by stabbing himself.  (R. 315.)  When Plaintiff was nineteen years old, he was admitted to the hospital for an "angry outburst" and saw a psychiatrist weekly.  (R. 308.)  In 2012, Plaintiff was admitted to the Central New York Psychiatric Center ("CNYPC") for psychotic symptoms, hallucinations, paranoia, and high risk of self-harm.  (R. 315.)  While at CNYPC Plaintiff started on Olanzapine and Clozapine.  The ALJ did not review any records from CNYPC.[4]  (R. 315.)

From January of 2013 through early 2016, Plaintiff was treated for symptoms of psychosis and paranoid schizophrenia.  (R. 313, 317–18, 324, 332, 370.)   In March of 2016, Plaintiff received consultative examinations from a family medicine specialist and a psychologist who noted that there was no evidence of hallucinations, delusions, paranoia, impaired judgment, or significant memory impairment.  (R. 370–76.)  However, in September of 2016 through June of 2018, Plaintiff was hospitalized several times and treated for several psychiatric disorders,

---

[4]  The ALJ made an unsuccessful attempt to secure medical records from CNYPC.  (R. 404.)  Plaintiff's hospitalization at CNYPC is detailed in the Psychiatric Evaluation from the Manhattan Psychiatric Center dated January 1, 2016.  (R. 315.)

including psychosis, schizophrenia, and schizoaffective disorder.[5]  (R. 407, 411, 416, 466, 468, 471.)

In June of 2018, the Visiting Nurse Service ("VNS") conducted a psychiatric evaluation of Plaintiff and noted that Plaintiff had a history of schizoaffective disorder, bipolar disorder, and paranoid delusions.  (R. 421–33.)   On February 12, 2019, VNS confirmed that Plaintiff has schizophrenia, which requires that he receives twenty-four-hour homecare, safety monitoring, and housing services.  (VNS Letter dated Feb. 12, 2019, annexed to Compl., Docket Entry No. 1 at 91.)  The February 12, 2019 determination was not provided to the ALJ.  (*See generally* R.)

### d.   The ALJ's decision

The ALJ conducted the five-step sequential analysis required by the SSA.[6]  20 C.F.R. § 416.920(a).  The ALJ found at step one that whether an individual is engaged in gainful activity was not relevant for redetermining disability at age eighteen.  *See* 20 C.F.R. 416.987(b) ("We will not use the rule in § 416.920(b) for people who are doing substantial gainful activity.").  (R. 11–12.)  At step two, he found that Plaintiff has the severe impairments of

---

[5]  A July 18, 2018 Administration Report of Contact form noted that Plaintiff failed to attend two consultative examination appointments in May and June of 2018.  (R. 288.)

[6]  The five-step sequential process outlined by the SSA considers:
> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Demars v. Comm'r of Soc. Sec.*, 841 F. App'x 258, 260–61 (2d Cir. 2021) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019)).

schizoaffective disorder and cannabis abuse.  (R. 12–13.)  At step three, the ALJ found that Plaintiff's impairments met Listing 12.03 (schizophrenia spectrum and other psychotic disorders).  (R. 13–14); *see* Listing § 12.03.  At step four, he found that Plaintiff had no past relevant work.  (R. 17.)  Under the sequential evaluation process, this would result in a finding of disability.  However, the ALJ then found that since March 29, 2016, if Plaintiff stopped his substance use, he would not have an impairment or combination of impairments that met or medically equaled the criteria of any of the listed impairments in the Listings.  (R. 14–15.)  He also found that since March 29, 2016, if Plaintiff stopped his substance abuse, he would have the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: could only perform a simple task job with at most occasional contact with supervisors, coworkers, and the public.  (R. 15–17.)  The ALJ concluded that if Plaintiff stopped his substance use, he could perform other work existing in significant numbers in the national economy.  (R. 17–18.)  He also determined that the substance use disorder was a contributing factor material to the determination of disability and Plaintiff would not be disabled if he stopped the substance use.  (R. 18.)  The ALJ noted that he accorded "significant weight" to the ME "because she had the opportunity to thoroughly review the entire record."  (R. 17.)  He only afforded the consultative physicians "some weight" because their opinions were based on examinations.  (R. 17.)

## II.  Discussion

### a.  Standard of Review

In reviewing a final decision of the Commissioner, a court must "determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir.

2022) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019)); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sczepanski v. Saul*, 946 F.3d 152, 157 (2d Cir. 2020) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would have to conclude otherwise." *Talyosef v. Saul*, 848 F. App'x 47, 48 (2d Cir. 2021) (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012)). In deciding whether substantial evidence exists, the court will "defer to the Commissioner's resolution of conflicting evidence." *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012)). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the Commissioner's decision. *See Ewen v. Saul*, No. 19-CV-9394, 2021 WL 1143288, at *11 (S.D.N.Y. Mar. 23, 2021) (citing *Moran*, 569 F.3d at 112)); *see also Prince v. Astrue*, 514 F. App'x 18, 19–20 (2d Cir. 2013) (first citing 42 U.S.C. § 405(g); and then citing *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).

      **b.** **The ALJ failed to develop the record to obtain psychiatric testing records and assessments from Plaintiff's treating providers**

        Plaintiff does not expressly argue that the ALJ failed to properly assess the record. However, attached to the Complaint, Plaintiff included medical records from Manhattan Psychiatric Care ("MPC") and letters from treating sources that were not in the Administrative Record. (*See* Compl. at 58–71.) On December 21, 2016, Seyed Siavash Ghazi, M.D., conducted a mental status examination of Plaintiff and determined his principal diagnosis to be paranoid schizophrenia. (*Id.* at 62–63.) On February 12, 2019, the VNS confirmed this diagnosis and stated that Plaintiff requires twenty-four-hour homecare, safety monitoring and housing services.

(*Id.* at 91.)  Previously, the VNS conducted a psychiatric evaluation of Plaintiff and determined that his medication noncompliance might be influenced by his auditory hallucinations.[7]  (R. 426.)

The Commissioner argues that substantial evidence supports the ALJ's consideration of the materiality of Plaintiff's substance abuse and the ALJ's finding that Plaintiff was not disabled since March 29, 2016.  In support, the Commissioner contends that the ALJ appropriately assigned significant weight to the ME's medical opinions because "the doctor had the opportunity to thoroughly review the record," (Comm'r's Mem. at 23), including treatment notes from Plaintiff's outpatient care at MPC and admission notes from Plaintiff's hospitalization at Brookdale Hospital.  (Comm'r's Mem. at 6–11.)

A district court must ensure that the ALJ has adequately developed the record in accordance with 20 C.F.R. § 404.1520(a)(3), which requires an ALJ to consider all evidence in the case record when making a determination or decision on a claimant's disability.  *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) ("[I]t is the rule in our circuit that the [social security] ALJ, unlike a judge in a trial, must [on behalf of all claimants] . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." (alterations in original) (quoting *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999))).  Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act," *Sczepanski*, 946 F.3d at 158 (quoting *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014)), "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative

---

[7]  An evaluation from the VNS taken in June of 2018 was provided to the ALJ by a VNS representative during Plaintiff's first hearing, (R. 34, 420–33), but the evaluation confirming Plaintiff's diagnosis was not reviewed by the ALJ before Plaintiff's second hearing.

record," *Burgess*, 537 F.3d at 128 (alteration in original) (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Yucekus v. Comm'r of Soc. Sec.*, 829 F. App'x 553, 558 (2d Cir. 2020) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel[.]" (alterations in original) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 n.1 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).  This duty is present "[e]ven when a claimant is represented by counsel."  *Moran*, 569 F.3d at 112 (collecting cases); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel . . . ." (citing *Rosa*, 168 F.3d at 79 & n.5)); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete." (first citing *Tejada*, 167 F.3d at 774; and then citing *Rosa*, 168 F.3d at 79)).  In addition, the ALJ must attempt to fill in gaps in the record.  *See Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 645 (2d Cir. 2020) ("When there is an obvious or 'clear gap[]' in the record, the ALJ is required to seek out missing medical records, even when a party is represented by counsel." (alteration in original) (quoting *Rosa*, 168 F.3d at 79)); *Rosa*, 168 F.3d at 79 & n.5 (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . , and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information" (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996))).

The duty to develop obligates the Commissioner "to develop a complete medical record," *Blash*, 813 F. App'x at 645 (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); and then citing 20 C.F.R. § 404.1512(b)), which is "detailed enough to allow the ALJ to determine the claimant's RFC," *Sigmen v. Colvin*, No. 13-CV-268, 2015 WL 251768, at *11 (E.D.N.Y. Jan. 20, 2015) (citing *Casino-Ortiz v. Astrue*, No. 06-CV-155, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007), *report and recommendation adopted*, 2008 WL 461375 (Feb. 20, 2008)). Pursuant to the SSA regulations, the Commissioner is obligated to "make every reasonable effort to help [the claimant] get medical evidence from [his] own medical sources and entities that maintain [his] medical sources' evidence when [the claimant] give[s] . . . permission to request the reports." 20 C.F.R. § 404.1512(b)(1); *see also Perez*, 77 F.3d at 47. The Commissioner's duty to make such efforts includes the duty to seek, as part of such medical evidence and reports, a medical source statement or functional assessment detailing the claimant's limitations. *See Robins v. Astrue*, No. 10-CV-3281, 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011) ("Social Security Ruling 96-5p confirms that the Commissioner interprets those regulations to mean that '[a]djudicators are generally required to request that acceptable medical sources provide these statements with their medical reports.'" (alteration in original) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996))). Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors (quoting *Pratts*, 94 F.3d at 39)); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) ("Failure to develop the record warrants remand." (first citing *Rosa*, 168 F.3d at 79–80; and then citing *Moran*, 569 F.3d at 113–15)); *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14

(S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record adequately is an independent ground

for vacating the ALJ's decision and remanding the case." (citing *Moran*, 569 F.3d at 114–15)),

*report and recommendation adopted*, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).

Nevertheless, even where an ALJ fails to develop the opinion of a treating physician, remand

may not be required "where . . . the record contains sufficient evidence from which an ALJ can

assess the petitioner's [RFC]." *Tankisi*, 521 F. App'x at 34.

      The ALJ failed to develop the record as to Plaintiff's disability since March 29, 2016

because the ALJ (1) did not consider or seek treatment from more recent records from MPC[8] or

more recent treatment records from VNS and (2) failed to seek additional information to clarify

unclear opinion evidence. *See Rosa*, 168 F.3d at 79 & n.5 (explaining that the ALJ must attempt

to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ

already possesses a 'complete medical history,'" the ALJ is under no obligation to seek

additional information (quoting *Perez*, 77 F.3d at 48)); 20 C.F.R. § 416.912(d)(2) (requiring the

ALJ to develop claimant's complete medical history).

> ### i.   The ALJ failed to develop the record because he did not seek recent inpatient psychiatric evaluations from MPC or VNS

      The ALJ failed to develop the record because the ALJ did not seek psychiatric

assessments from Plaintiff's treating physicians after March 29, 2016.  Rather, the ALJ's

decision demonstrates that the ALJ drew conclusions primarily from the medical notes and

records in Plaintiff's file.  For example, the ALJ relied on outpatient treatment notes from MPC

---

[8]  The Complaint includes inpatient psychiatric evaluations and assessments from MPC from December of 2016 that were not included in the administrative record, including a "Health maintenance Form" that states that Plaintiff's primary diagnosis is schizophrenia.  (*See* Compl. at 58–71.)

14

to conclude that Plaintiff was generally psychiatrically stable from 2012 through 2015.[9]  (R. 13, 16, 324, 341, 343–45, 348–49, 351, 353.)  The ALJ then cited medical notes from Plaintiff's emergency room visits and hospitalizations to indicate that Plaintiff's psychiatric impairment worsened during and after 2016.  (R. 13, 409–12, 416, 421, 428, 452, 463, 466–75, 610, 654–57.)  The ALJ also cited to medical records from emergency room visits to Bellevue Hospital in 2017 and 2018 as evidence that Plaintiff's substance abuse contributed to his medication noncompliance and deteriorating mental state.  (R. 13, 463, 468, 473, 657.)  The ALJ noted that Plaintiff "was psychiatrically stable and able to care for himself, but [there] 'remains a possible risk for readmission if he continues with marijuana use and if non-complaint with treatment and medication.'"  (R. 13.)  The ALJ relied on these reports to conclude that, absent substance abuse, Plaintiff could perform other work existing in significant numbers in the national economy, including unskilled and SVP level two jobs of addressing clerk, price marker, and kitchen helper. (R. 18.)  None of these records assess Plaintiff's restrictions or provide an assessment of his functional limitations since March 29, 2016.  (*See* R. 315–54, 370–77, 466–69, 654–57, 658–59.)

The record largely consists of medical notes from Plaintiff's visits with his providers and does not identify any functional assessments from Plaintiff's providers aside from that offered in the consultative reports.  For example, Plaintiff's medical records after March 29, 2016, indicate

---

[9]  The Commissioner argues that treatment notes from the MPC outpatient clinic indicate that Plaintiff maintained psychiatric stability and was functional in the community from January of 2012 through January of 2013.  (Comm'r's Mem. 6.)  However, other MPC medical notes state that Plaintiff had been in incarcerated from April 6, 2012, through August 10, 2012, due to psychotic behavior, hallucinations, high risk of harm to self and others, paranoia, refusing medication, and exhibiting poor grooming and hygiene.  (R. 332.)  Similarly, the Commissioner argues that treatment notes from the MPC outpatient clinic indicate that Plaintiff maintained psychiatric stability from January of 2013 through January of 2015.  (Comm'r's Mem. 7.)  However, psychiatric evaluation notes from Dr. Haruyo Fujiwaki state that Plaintiff was psychiatrically hospitalized in 2013 for two months and then transferred to MPC for three to four months.  (R. 374.)

15

that Plaintiff had ongoing mental health issues necessitating treatment.  (R. 406–07, 408–15, 416, 421–33, 441–662.)  However, the records relied on are primarily medical notes describing his symptoms and examinations that do not assess his functional capacity.  (*See* R. 406–407, 408–415, 416, 421–433, 441–662.)  Indeed, the ME testified that it would be "difficult . . . to rate [Plaintiff's functioning] because [they did not] have any testing done on the [Plaintiff]."  (R. 53.) Moreover, the ALJ received a psychiatric evaluation from VNS during Plaintiff's first hearing, (R. 34, 421–33), but failed to obtain corresponding functional assessments or other information related to the evaluation before the second hearing,[10] (*see* R. 34, 421–33).   In fact, none of the providers from whom Plaintiff received treatment after March 29, 2016, provided complete functional assessments; their treatment records consist largely of summaries of the Plaintiff's self-reported psychiatric history, session notes, and reports of how the Plaintiff was feeling on the particular day that he was seen.  (R. 406–07, 408–15, 416, 421–33, 441–662.)  The lack of functional assessments from Plaintiff's providers after March 29, 2016, constitutes an evidentiary gap in the record warranting remand for further development.  *See Rodriguez v. Kijakazi*, No. 20-CV-9040*, 2021 WL 5154112, at *3 (S.D.N.Y. Nov. 5, 2021) (finding that the ALJ failed to develop the record as to plaintiff's metal impairments because the ALJ did not "appear to have requested any" . . . "mental health functional assessment from [the plaintiff's] treating sources or from a consultative source and reli[ed] on cherry-picked comments from doctors who were not evaluating or treating [p]laintiff for his mental health conditions"); *Obremski v. Kijakazi*, No. 20-CV-3902, 2021 WL 3163169, at *10, *16 (S.D.N.Y. July 27,

---

[10]  Plaintiff appeared at his first hearing accompanied by witness Mohammad Garland from the VNS ACT program.  (R. 26.)  Garland presented the ALJ with Plaintiff's psychiatric evaluation and stated that Plaintiff was being treated by psychiatrists under his program.  (R. 34.) The evaluation was scanned into the record after the hearing.  (R. 37.)

2021) (remanding for failure to develop the record because the ALJ, "consistent with her duty to develop the record, should have affirmatively sought . . . a function-by-function analysis" instead of disregarding the treating physician's opinion and stating that "the 'treating physician rule' is inextricably linked to a broader duty to develop the record . . . [and] [p]roper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination" (quoting *Lacava v. Astrue*, No. 11-CV-7727, 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012))); *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502, 2021 WL 363682, at *11 (S.D.N.Y. Jan. 29, 2021) (finding that the ALJ failed to develop the record as to the plaintiff's mental impairments because the ALJ "should have requested a functional assessment of [the plaintiff's] mental capacity from later in her treatment to better understand the impact of treatment over time" when the record only contained an early functional assessment at the start of the plaintiff's treatment and two consultative exams, and stating that "[c]ourts in this Circuit have consistently held, albeit . . . in the treating physicians context, that when an ALJ has to determine an RFC, their failure to request a functional assessment when no such assessment exists in the record, or when any such assessments are insufficient, is a failure of their duty to develop the record" (citing *Romero v. Comm'r of Soc. Sec.*, No. 18-CV-10248, 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020))), *report and recommendation adopted*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022); *Lee v. Saul*, No. 19-CV-9451, 2020 WL 5362619, at *17 (S.D.N.Y. Sept. 8, 2020) ("[L]eft without a viable medical opinion setting forth [the plaintiff's] functional limitations and abilities, the RFC is largely supported by the ALJ's own interpretation of the medical records, including the MRIs and X-rays contained therein.  Given the lack of any controlling medical opinion — or at least one that the ALJ did not largely discount — the ALJ

17

has improperly filled this evidentiary void with his own medical judgment and interpretation of these records." (collecting cases)); *Merriman v. Comm'r of Soc. Sec.*, No. 14-CV-3510, 2015 WL 5472934, at *17–19 (S.D.N.Y. Sept. 17, 2015) (finding that the ALJ "failed in his duty to develop the record fully" when the ALJ did "not cite any functional assessments in support of his finding that [the] plaintiff retained the RFC to perform medium work" and "[t]he only medical evidence in the record cited by the ALJ in support of his physical RFC determination is . . . treatment notes," but "[t]reatment notes, however, are not ordinarily a substitute for a treating physician's opinion, and [the doctor's] treatment notes do not address plaintiff's exertional and nonexertional limitations" (citations omitted)); *Legall v. Colvin*, No. 13-CV-1426, 2014 WL 4494753, at *4 (S.D.N.Y. Sept. 10, 2014) (finding that the ALJ failed to develop the record by not seeking a medical opinion from the plaintiff's treating physicians or other acceptable medical source when the "only medical evidence in the record cited by the ALJ in support of his RFC determination is [the plaintiff's] treatment records"); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 348 (E.D.N.Y. 2010) ("[T]he ALJ failed to obtain an adequate medical assessment of [the plaintiff's] functional abilities. . . . [T]he record contains no opinions from any of [the plaintiff's] treating physicians regarding his functional abilities during the relevant period."); *see also* 20 C.F.R. § 404.1512 ("Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources.").

To the extent that the ALJ relied on functional assessments from Plaintiff's past consultative examiners or medical expert instead of Plaintiff's treating providers, the ALJ was not permitted to do so without first seeking clarification from Plaintiff's long-term providers. *See Manago v. Kijakazi*, No. 20-CV-1251, 2021 WL 4408966, at *9 (E.D.N.Y. Sept. 26, 2021) (remanding social security action where the record largely consisted of medical notes from the

plaintiff's visits with his consultative examiners and the ALJ did not seek clarification of functional assessments from long-term providers); *Mary D. v. Kijakazi*, No. 20-CV-656, 2021 WL 3910003, at *9–10 (D. Conn. Sept. 1, 2021) ("To further develop the record with treating source opinions, the ALJ should have sought clarification or further evidence from . . . plaintiff's long-time cardiologist, before according greater weight to the testimony of a medical expert who did not examine plaintiff. . . . Without further development of the treating source opinions, the administrative record was not sufficient to enable the ALJ to produce a reasoned RFC determination." (citations omitted)); *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941, 2021 WL 3475625, at *10 (S.D.N.Y. Aug. 6, 2021) (remanding for an ALJ's failure to develop the record by obtaining a functional assessment from the plaintiff's treating physicians despite having a consultative examiner's opinion in the record).

Accordingly, the Court finds that the ALJ failed to adequately develop the record to obtain a functional assessments of Plaintiff's RFC and this failure requires remand.

### ii. The ALJ failed to adequately develop the record to clarify Plaintiff's mental health diagnosis

Moreover, the ALJ also should have developed the record to seek clarification in view of the perceived inconsistencies. The ALJ believed "[s]chizophrenia is a much more severe diagnosis tha[n] schizoaffective [disorder]," and afforded significant weight to the ME's medical opinion that Plaintiff had schizoaffective disorder rather than schizophrenia and that Plaintiff's "symptoms would improve if he stopped smoking cannabis." (R. 53–54, 16.) The ME provided this diagnosis without reviewing any functional assessments. (R. 53.) These conclusions are contrary to Plaintiff's recent treating sources who diagnosed Plaintiff with paranoid schizophrenia, (*See* Compl. at 91, 119; R. 428), and determined that Plaintiff's medication

noncompliance may be caused by factors other than substance abuse, (R. 426).[11]  To satisfy his

threshold duty to develop the record, the ALJ should have obtained functional assessments from

Plaintiff's treating sources for the ME to review and followed up with the ME to request

documentation in the record that supported the ME's findings or to obtain additional

explanations for her contrary findings.  *See Rosa*, 168 F.3d at 79 ("Even if the clinical findings

were inadequate, it was the ALJ's duty to seek additional information from the treating

physician *sua sponte*." (alterations omitted) (quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.

1998))); *Diana P. v. Kijakazi*, No. 20-CV-00837, 2021 WL 4305005, at *8 (D. Conn. Sept. 22,

2021) ("Where . . . an ALJ perceives inconsistencies in a treating physician's report, the ALJ

bears an affirmative duty to seek out more information from the treating physician and to

develop the administrative record accordingly . . . by making every reasonable effort to re-

contact the treating source for clarification of the reasoning of the opinion." (alteration in

original) (quoting *Corbeil v. Colvin*, No. 12-CV-114, 2015 WL 1735089, at *7 (W.D.N.Y. Apr.

16, 2015))); *Ahisar v. Comm'r of Soc. Sec.*, No. 14-CV-4134, 2015 WL 5719710, at *12

(E.D.N.Y. Sept. 29, 2015) ("[I]f a physician's report is believed to be insufficiently explained,

lacking in support, or inconsistent with the physician's other reports, the ALJ must seek

clarification and additional information from the physician, as needed, to fill any clear gaps

before rejecting the doctor's opinion." (quoting *Correale-Englehart v. Astrue*, 687 F. Supp. 2d

396, 428 (S.D.N.Y. 2010))); *Vazquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900, 2015 WL

4562978, at *17 (S.D.N.Y. July 21, 2015) ("[W]here a treating physician's opinion is 'out of

sync with the treating notes, the ALJ [does] not have the luxury of terminating his inquiry at that

---

[11]  The VNS psychiatric evaluation states that Plaintiff's "[medication] noncompliance
might be influenced by [his] hallucinations."  (R. 426.)

stage in the analysis.'  Rather, the ALJ must further develop the record to 'fill any clear gaps'

and resolve the inconsistency." (second alteration in original) (citation omitted) (quoting *Hidalgo

v. Colvin*, No. 12-CV-9009, 2014 WL 2884018, at *19 (S.D.N.Y. June 25, 2014))).  The ALJ

should "make reasonable efforts to resolve any perceived inconsistencies by seeking

supplemental or updated medical source statements from the Plaintiff's treating psychiatrist or

other treating clinicians."  *Diana P.*, 2021 WL 4305005, at *8.

      Accordingly, the Court finds that the ALJ failed to adequately develop the record to

clarify inconsistencies in Plaintiff's mental health diagnosis.

      **iii.  The Court cannot further assess whether the ALJ's findings were supported by substantial evidence**

      The Court is unable to review whether the ALJ's denial of benefits was based on

substantial evidence in the record.  *See Mary D.*, 2021 WL 3910003, at *10 ("Because the ALJ's

failure to develop the record is a threshold issue that impacts all aspects of a disability claim, the

[c]ourt declines to address the other arguments that plaintiff raised in her brief."); *Baez v.

Comm'r of Soc. Sec.*, No. 17-CV-3595, 2018 WL 4688951, at *9 (E.D.N.Y. Sept. 28, 2018) ("As

the Court has previously noted, where 'an ALJ fails to adequately develop the record in reaching

a conclusion as to a claimant's residual functional capacity, the Court is unable to review

whether the ALJ's denial of benefits was based on substantial evidence.'" (quoting *Rivera v.

Comm'r of Soc. Sec.*, No. 15-CV-837, 2016 WL 614688, at *15 (E.D.N.Y. Feb. 16, 2016)));

*Corona v. Berryhill*, No. 15-CV-7117, 2017 WL 1133341, at *18 (E.D.N.Y. Mar. 24, 2017)

(declining to address arguments as to whether the ALJ properly assessed the plaintiff's

credibility when remanding for failure to develop the record); *Ayer v. Astrue*, No. 11-CV-83,

2012 WL 381784, at *7 (D. Vt. Feb. 6, 2012) (declining to address arguments as to whether the

plaintiff was disabled because the administrative law judge failed to adequately develop the

record); *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at \*4 (E.D.N.Y. Mar. 31, 2011) (noting that when the ALJ fails to develop the record, "the [c]ourt need not — indeed, cannot — reach the question of whether the [ALJ's] denial of benefits was based on substantial evidence") (second alteration in original) (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999))).

Accordingly, the Court remands for the ALJ to further develop the record. *See Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) ("That is, when 'further findings would so plainly help to assure the proper disposition of [the] claim, we believe that remand is particularly appropriate.'" (alteration in the original) (quoting *Rosa*, 168 F.3d at 83)); *Mantovani*, 2011 WL 1304148, at \*4.

### III.  Conclusion

For the foregoing reasons, the Court denies the Commissioner's motion for judgment on the pleadings.  The Commissioner's decision is vacated and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.

Dated: September 10, 2022
        Brooklyn, New York

                                        SO ORDERED:


                                        _____s/ MKB_____
                                        MARGO K. BRODIE
                                        United States District Judge